UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

VENUS McCLUSKEY,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:12-cv-617
Beckwith, J.
Litkovitz, M.J.

REPORT AND
RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 12), the Commissioner's memorandum in opposition (Doc. 17), and plaintiff's reply memorandum (Doc. 20).

I. Procedural Background

Plaintiff filed applications for DIB and SSI in January 2009, alleging disability since January 5, 2009, due to mania, bipolar disorder, a rod in her left leg, and disc problems in her back. Plaintiff's applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a de novo hearing before Administrative Law Judge (ALJ) Paul Yerian. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On April 11, 2011, the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] met the insured status requirements of the Act on January 5, 2009, the alleged onset date, and continued to meet those requirements through December 31, 2010, but not thereafter.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since January 5, 2009 (Exhibit 3D) (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: status post remote left tibia-fibula fracture with rod placement; status post left distal fibula transverse fracture in 2008 (Exhibit 2F); obesity; borderline intellectual functioning; major depression; anxiety disorder, NOS; and a personality disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, [the ALJ] find[s] that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the [plaintiff] cannot climb ladders, balance, kneel, or crawl. The claimant can occasionally climb stairs, stoop, or crouch. Due to the [plaintiff]'s mental impairments, the work should be limited to simple, repetitive tasks and should not involve rapid pace or strict time or production standards. The [plaintiff] can maintain attention for at least two-hour segments, and she can maintain brief and superficial contact with others.

6. The [plaintiff] cannot perform her past relevant work (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1975 and was 33 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has a limited education and can communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from January 5, 2009, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-23).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[1] Plaintiff's past relevant work was as a sales clerk, fast food worker, nurse's aide, and dietary aide. (Tr. 21-22).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the light, unskilled jobs of tie binder and injection mold machine tender. (Tr. 22-23).

4

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

The pertinent medical findings and opinions have been adequately summarized in the plaintiff's Statement of Errors and will not be repeated here. (Doc. 12 at 2-7). Where applicable, the Court will identify the medical evidence relevant to its decision.

On appeal, plaintiff raises three assignments of error: (1) the ALJ improperly found that plaintiff's back pain was not a "medically determinable impairment"; (2) the ALJ improperly

5

weighed the various medical opinions in the record; and (3) the ALJ improperly assessed plaintiff's credibility.

**1. The ALJ's finding that plaintiff's low back pain is not a medically determinable impairment is supported by substantial evidence.**

The ALJ determined that the low back pain about which plaintiff testified is not a medically determinable impairment under the regulations. (Tr. 14, citing 20 C.F.R. §§ 404.1508, 416.908).[3] The ALJ found that the objective medical evidence failed to disclose any underlying orthopedic or musculoskeletal abnormality in the spine, citing to March 2009 x-rays of the lumbar spine, which revealed no fracture-dislocation, vertebral bodies of normal height, and well-maintained disc spaces. (Tr. 14).

Plaintiff argues the ALJ's finding in this regard is without substantial support in the record because evidence aside from the x-rays supports a finding of a severe impairment. The Commissioner contends that even if the ALJ erred, such error is harmless given the VE's testimony in this case.

The evidence of plaintiff's back impairment is sparse. Dr. Ray, a consultative examiner, opined that plaintiff's physical examination, medical records, and x-ray study are most compatible with a lumbosacral sprain/strain. (Tr. 291). Plaintiff told Dr. Ray she suffered a lifting injury while working as a nursing assistant several months before. On examination, there was a "mild" malalignment of the spine and tenderness in the midline lumbosacral area. (Tr. 290). The

---

[3]Title 20 C.F.R. § 404.1508 governs "What is needed to show an impairment":

> If you are not doing substantial gainful activity, we always look first at your physical or mental impairment(s) to determine whether you are disabled or blind. Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms (see § 404.1527). . . .

6

remainder of the examination was essentially normal, with negative straight leg raising, no muscle spasms, and no tenderness over the right or left lumbosacral paraspinal areas. *Id.* Records from the Price Hill Clinic in March 2008 include a diagnosis of chronic low back pain "secondary to degenerative disc disease." (Tr. 248). However, plaintiff has not cited to any objective or clinical tests to support this single notation of "degenerative disc disease"[4] and x-rays in March 2009 showed no abnormalities.

Given the paucity of evidence supporting a back or spinal impairment, the ALJ's finding of no medically determinable low back impairment is supported by substantial evidence. Even if the ALJ erred in this regard, the error would be harmless. Plaintiff contends the ALJ failed to consider her need to alternate sitting and standing and the limitation on bending to reduce her back pain. (Doc. 12 at 12). Yet, when asked to consider the functional limitations imposed by Dr. Ray which incorporated these limitations, the VE testified that the significant number of jobs she previously identified could be performed with a sit/stand option. (Tr. 62-63). Plaintiff's first assignment of error is without merit and should be overruled.[5]

**2. The ALJ erred in weighing the medical opinions of record relating to plaintiff's mental impairments.**

Plaintiff's second assignment of error alleges that the ALJ improperly weighed the various medical opinions of record. She asserts the ALJ failed to give proper weight to the opinion of

---

[4]Plaintiff's statement of errors states "there was mention made of an MRI taken at Western Imaging which revealed degenerative disc disease (Tr. 244, 248, 288)." (Doc. 12 at 3-4). The notation referenced by plaintiff states, "please get MRI [illegible] Western Imaging [illegible]," along with an additional notation "can not get MRI d/t metal." (Tr. 244). There is no evidence that an MRI revealed degenerative disc disease.

[5]For the same reason, to the extent plaintiff's second assignment of error asserts the ALJ erred by not crediting Dr. Ray's functional capacity assessment in assessing plaintiff's RFC, the assignment of error should be overruled. Because the VE testified plaintiff would still be able to perform a significant number of jobs given the limitations imposed by Dr. Ray, any error by the ALJ would be harmless.

7

David Chiappone, Ph.D., the examining psychologist, who opined that plaintiff was markedly limited in her ability to relate to co-workers, supervisors, and the public. Plaintiff alleges the ALJ erred in relying on and giving more weight to the opinions of the state agency psychologists, and that Dr. Chiappone's opinion concerning plaintiff's functional limitations is consistent with her work history, multiple psychiatric hospitalizations, and treatment at Greater Cincinnati Behavioral Health.

The applicable regulations set forth three types of acceptable medical sources upon which an ALJ may rely: treating source, nontreating source, and nonexamining source. 20 C.F.R. §§ 404.1527, 416.927. A treating source opinion on the nature and severity of a claimant's impairments is generally entitled to the most weight, and the Social Security Administration must give "good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). This "good reasons" requirement applies *only* to treating sources. *Smith,* 482 F.3d at 876. "With regard to nontreating, but examining, sources, the agency will simply generally give more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has not examined him." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1)[6]) (internal citations omitted). Where a medical source is not a treating source, the ALJ must consider the following factors in determining how much weight to afford the opinion: the length and nature of the treatment

---

[6]20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion were previously found at §§ 404.1527(d) and 416.927(d) and are now found at §§ 404.1527(c) and 416.927(c)

8

relationship, the evidence that the physician offered in support of his opinion, the consistency of the opinion with the record as a whole, and whether the physician was practicing a specialty. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). *Ealy*, 594 F.3d at 514.

Plaintiff underwent a psychological consultative evaluation by Dr. Chiappone on March 30, 2009. (Tr. 279-286). Dr. Chiappone noted plaintiff's history of sexual abuse as a child and tumultuous and abusive relationships as an adult. During the consultative examination, Dr. Chiappone observed that plaintiff "was a bit distant and seemed a bit uncomfortable being evaluated" but she put forth good effort and persistence. (Tr. 281). He observed that plaintiff presented as being depressed as noted by depressive statements, displayed decreased energy and was somewhat pessimistic, and exhibited anxiety by appearing "tense and uncomfortable being evaluated." (Tr. 281-282). Although plaintiff was able to follow Dr. Chiappone's directions, she had a slow work pace, and her concentration, attention, and memory were reduced. (Tr. 282). Dr. Chiappone diagnosed Major Depression; Anxiety, NOS; Borderline Intellectual Functioning; and Personality Disorder with Cluster B features. (Tr. 284). He assigned a GAF score of 45.[7] (*Id.*). He opined that plaintiff is moderately impaired in her ability to remember simple one- and two-step instructions, in her ability to carry out and persist over time, and in her ability to tolerate the stress of day-to-day work. *Id.* Dr. Chiappone also opined that plaintiff has marked impairments in her ability to relate to coworkers, supervisors, and the public because she presented as being

---

[7] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM–IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.* at 32. Individuals with scores of 51–60 are classified as having "moderate" symptoms. *Id.*

9

anxious and unsure of herself and she would have difficulty dealing with give and take, since her anxiety and depression would interfere. *Id.*

Alice Chambly, Psy.D., the state agency non-examining psychologist who reviewed the record in May 2009, noted that plaintiff was admitted to University Hospital for a three-day evaluation due to suicidal thoughts and had been off her medications for six months; she was depressed and anxious; and on mental status examination she was pleasant, engaging, had good eye contact, normal speech, good mood, euthymic affect, organized thoughts, and was goal directed. She was diagnosed with mood disorder, NOS, rule out MTD (manic thought disorder), and personality disorder, NOS, given a GAF of 65, and discharged with medications. (Tr. 313, citing Tr. 260). Dr. Chambly also noted the examination and specific findings of Dr. Chiappone, and stated "weight given to the CE examiner with above mentioned exception regarding marked social limitations." (Tr. 313). Dr. Chambly adopted the moderate limitations imposed by Dr. Chiappone, but rejected the "marked" limitation in social functioning imposed by the consultative examiner stating plaintiff "related well to examiner, socializes with friend and mother." (Tr. 313). State agency reviewer Dr. Tishler, Ph.D., affirmed this assessment in September 2009. (Tr. 324).

The ALJ gave great weight to and adopted the mental RFC assessment of the state agency non-examining psychologists. The ALJ noted that the state agency psychologists did not adopt Dr. Chiappone's assessment that plaintiff was markedly impaired in her ability to relate to others, "as the record showed that the claimant related well to the examiner and socialized with a friend and her mother." (Tr. 20). The ALJ acknowledged that the state agency psychologists did not have access to the most recent records, but stated that the information in those reports is "not reflective of any significant change since the state agency mental assessment. . . ." (Tr. 21).

10

It is difficult to understand how plaintiff's purported ability to "relate[] well" to Dr. Chiappone during his single evaluation evidences an ability to relate to coworkers, supervisors, and the public on a regular and sustained basis, particularly since Dr. Chiappone, the professional who actually conducted the evaluation, did not reach this conclusion on the basis of his first-hand knowledge. Likewise, plaintiff's ability to "socialize" with a single friend and her mother[8] says little about her ability to relate to others in the work setting. More importantly, the ALJ's finding that the medical evidence subsequent to the paper reviews by the state agency psychologists did not reflect any significant change in plaintiff's mental health status is without substantial support in the record.

Subsequent to the state agency psychologists' reviews upon which the ALJ relied, plaintiff was hospitalized twice more for her psychiatric impairments. (Tr. 350-376). On March 18, 2010, plaintiff was admitted to Appalachian Behavioral Healthcare for a 72-hour hold based on depression with suicidal ideation. (Tr. 356). She was homeless at the time. She reported that she had been prescribed medication to treat her depression upon her discharge from University Hospital two weeks earlier[9], but she was unable to afford to fill the prescription and her depression quickly returned. *Id.* Plaintiff was diagnosed with major depressive disorder, recurrent, severe, without psychosis; possible PTSD; and possible panic attack disorder, and was assigned an initial GAF of 25. (Tr. 356). Plaintiff was stabilized on medication during her hospital course. On discharge, 27 days later, plaintiff was assigned a GAF of 55 and discharged to reside with a friend in Athens, Ohio. (Tr. 362).

---

[8] It appears the state agency consultant was referencing Dr. Chiappone's notation that plaintiff "has contact with her mother, visiting her or calling her. She gets together with one friend to talk." (Tr. 283).

[9] The record does not contain evidence of this hospitalization.

11

Five days later, plaintiff was re-admitted to Appalachian Behavioral Healthcare for an additional 24 days (April 19, 2010 to May 13, 2010). (Tr. 350-355). Plaintiff reported that the housing arrangements she had made upon her initial discharge had fallen through and she was still homeless, which caused her depression and suicidal ideation to return. (Tr. 350). She reported feeling depressed and anxious and unable to get along well with others. *Id.* The records note plaintiff's history of relationships with males who are abusive and exploitive of her and her long history of traumatic recollections of past abuse with flashbacks and nightmares. She was stabilized with medications and therapy, and at discharge she was diagnosed with major depressive disorder and possible PTSD. (Tr. 355). Her GAF score upon admission was 25 and upon discharge was 55. (*Id.*). She was discharged to a respite center for the evening and was given bus fare to return to Cincinnati to seek assistance from a battered women's shelter and begin treatment at Greater Cincinnati Behavioral Health ("GCBH"). (*Id.*).

Between October 2010 and December 2010, plaintiff was treated by Dr. Coleman at Healthcare for the Homeless for GERD, PTSD, anxiety, depression, chronic back and left leg pain, and diarrhea. (Tr. 235-348). In October 2010, Dr. Coleman referred plaintiff to GCBH for a mental health assessment. (Tr. 330). In November 2010, plaintiff reported that she was feeling more isolated and staying away from people. (Tr. 327). In December 2010, Dr. Coleman reported that plaintiff was repeating her sentences; was worried, panicky, anxious, and not sleeping well; and was sleeping at her mother's while it was cold outside. (Tr. 328). Dr. Coleman prescribed psychotropic medication for plaintiff. (Tr. 328).

On November 2, 2010, plaintiff was evaluated by Karla Lang, LSW, from GCBH. (Tr. 331-341). She was homeless and staying by the river near the stadium. Plaintiff reported that due

12

to depression, she isolates and is irritable, her weight varies due to variable appetite, and she gets very angry and finds it hard to control her temper or to relate to others. (Tr. 337). She also experiences flashbacks and has nightmares of her past abuse. *Id.* Plaintiff reported she could not afford her medications so she had not taken them. (Tr. 332). The note indicates that plaintiff had a fiancé, attended church, and "talk[s] to family." (Tr. 333). Ms. Lang observed that plaintiff was a bit guarded or fearful, she had a blunted affect and apathetic mood, she had a bit of trouble remembering dates of events in recent past, and her insight was limited and judgment poor. (Tr. 338). Ms. Lang concluded that plaintiff has chronic PTSD; Bipolar I Disorder, most recent episode depressed; rule out Borderline Personality Disorder; and she assigned a GAF of 45, indicating "serious" symptoms, *e.g.*, suicidal ideation, or any serious impairment in social, occupational or school functioning (*e.g.*, no friends or unable to keep a job). DSM-IV-TR at 32. (Tr. 341).

As the ALJ acknowledged, neither Dr. Chambly nor Dr. Tishler, the state agency psychologists, considered the treatment records from plaintiff's lengthy psychiatric hospitalizations in March, April and May of 2010, Dr. Coleman's Healthcare for the Homeless records, or the mental health assessment from GCBH. Nevertheless, the ALJ concluded that those reports "are not reflective of any significant change." (Tr. 21). Contrary to the ALJ's conclusion, which he failed to support with any explanation or citation to the record, the evidence of plaintiff's mental health treatment subsequent to the state agency opinions indicates plaintiff had significant changes in her mental health status, including two psychiatric hospitalizations at Appalachian Behavioral Healthcare for suicidal ideation and depression lasting nearly two months. These lengthy psychiatric hospitalizations alone appear to constitute a "significant"

change from the time of the state agency consultants' opinions. In addition, this later evidence indicates that plaintiff had become homeless, continued to engage in dysfunctional relationships with others who abused and mistreated her, and was without the support of family or friends. (Tr. 350). The mental health assessment from GCBH indicates that plaintiff continued to experience serious symptoms from a mental health standpoint. (Tr. 331-342). While the ALJ believed these records did not reflect any significant change in plaintiff's mental health status, there was no state agency psychologist review or other medical opinion in the record concerning them. To be sure, as reflected in the ALJ's decision, some of the clinical notes are more upbeat than others. However, looking at those records as a whole, it is difficult to see how the ALJ could characterize plaintiff's overall mental health status as not significantly changed, especially in light of her almost two-month long psychiatric hospitalizations, and to reconcile the ALJ's conclusion with plaintiff's history of repeated psychiatric hospitalizations and subsequent homelessness. Absent any medical evaluation of plaintiff's lengthy psychiatric hospitalizations in March 2010 through May 2010 and the mental health assessment from GCBH in light of plaintiff's history, the ALJ's conclusion that plaintiff's psychological status did not significantly change is conjectural and does not find substantial support in the record. In short, given the severe psychiatric problems plaintiff experienced subsequent to the reviews by the state agency psychologists, the ALJ's decision is not supported by substantial evidence and should be reversed and remanded for consideration of the entire course of plaintiff's psychiatric treatment in assessing her claim for disability.

In addition, the ALJ's decision notes that plaintiff is "often noncompliant with her psychotropic medications, which appears to lead to bad relationship choices, homelessness, and ultimately depression. She is now living in an apartment and has family support. She has

reported that she is again taking her psychotropic medications." (Tr. 21). The ALJ's decision suggests that plaintiff's noncompliance with medications precludes a finding of disability because plaintiff functioned well on medication. Yet, the record is replete with references to plaintiff's inability to afford her prescription medications as a reason for her noncompliance. Thus, it was incumbent upon the ALJ to further develop the record on this point and allow plaintiff to explain the reasons for not taking medication as prescribed. *See* SSR 82-59, 1982 WL 31384, *2 (Claimants "should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal.").

Finally, the Commissioner suggests any error the ALJ made in finding "moderate" as opposed to "marked" limitations in plaintiff's ability to interact with others is harmless because the ALJ nonetheless restricted plaintiff to only "brief and superficial contact with others." (Doc. 17 at 7). The Commissioner's reasoning presupposes that the restriction imposed by the ALJ is the appropriate way to accommodate a "marked" limitation in interacting with others. On the basis of the current record, however, it is more likely that because the ALJ determined plaintiff has a "moderate" restriction in social functioning, the limitation of "brief and superficial contact with others" imposed by the ALJ was the appropriate accommodation for a "moderate" restriction, not a "marked" restriction. In any event, the VE testified that if Dr. Chiappone's limitations were credited, there would be no jobs plaintiff could perform (Tr. 64-65), indicating that Dr. Chiappone's "marked" limitation was more restrictive than argued by the Commissioner.

For the reasons stated above, the Court finds plaintiff's second assignment of error well-taken and recommends that the matter be reversed and remanded to the ALJ for further

proceedings consistent with this Report.

Plaintiff acknowledges that on the basis of the current record a reversal for an award of benefits would not be an appropriate remedy in this case; rather this matter should be remanded for further vocational and medical development. (Doc. 20 at 2 n.3). The Court agrees and, accordingly, need not reach plaintiff's third assignment of error that the ALJ erred in assessing plaintiff's credibility.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be REVERSED AND REMANDED for further proceedings consistent with this opinion.

Date: 7/17/13

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

VENUS McCLUSKEY,  
    Plaintiff,

vs.

COMMISSIONER OF  
SOCIAL SECURITY,  
    Defendant.

Case No. 1:12-cv-617  
Beckwith, J.  
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

17